EDWARD R. BENNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Benner v. Commissioner
Docket No. 10032-75.
United States Tax Court
T.C. Memo 1977-162; 1977 Tax Ct. Memo LEXIS 276; 36 T.C.M. (CCH) 682; T.C.M. (RIA) 770162; May 31, 1977, Filed Edward R. Benner, pro se. Rebecca T. Hill, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1968
$ 902.00
1969
373.00
1971
1,293.00
The sole issue presented for our decision is whether petitioner is entitled to a casualty loss deduction under section 165(c)(3)[1] for an alleged decrease in the fair market value of his wife's home. FINDINGS OF FACT Some of the facts have been stipulated and are so found. *277 During the years at issue, petitioner was married and filed joint income tax returns with his now former wife. Their 1971 joint return was filed with the Fresno Service Center, Fresno, California. Petitioner resided in San Francisco, California, at the time he filed his petition herein. On July 31, 1969, petitioner's wife purchased the personal residence that is the subject of the claimed casualty loss. The house, originally constructed in 1963, is a three-bedroom, three-bath, all redwood, two-story residence, located at 990 Ocean Boulevard, Moss Beach, California, in San Mateo County. The house sits on the edge of a cliff about 100 feet above a rocky beach. Petitioner's wife bought the property for $45,000 and financed the purchase by paying approximately $10,500 in cash and signing a note, secured by a deed of trust, in which she agreed to pay the remaining $34,500 with a 7-percent interest at $271 per month, the balance being due at the end of ten years. In late 1970, petitioner noticed cracks in the driveway and, during this same time period, there occurred a break in the water line running between the house and the main line. From conversations with local geologists, *278 petitioner learned that these problems were caused by unstable land and soil conditions in the area. In early 1971, petitioner obtained a copy of a geologic study of the land in that area. This study, dated March 15, 1971, indicated that the area in which the house was located was quite unstable. The information and conclusions contained in the study caused petitioner to ask the county tax assessor to reappraise the house. The county appraiser determined that, as of July 1, 1971, the fair market value of the house was $19,752. In making this appraisal, the county appraiser noted that his reappraisal was based on recent geological reports. At various times over the period of 1965 to 1976, the same county appraiser valued the subject property as follows: Years
Amount
1965-1971
$27,020.00
March 1, 1971
39,904.00
July 1, 1971
19,752.00
1972-1973
38,000.00
1974
39,000.00
1975-1976
45,000.00
At some point in time, the Board of Supervisors of San Mateo County (hereinafter the Board) contracted with the U.S. Geological Survey to conduct and report on the stability of the soils in the area, including erosion potentials and the location of various earthquake *279 faults. During the first few months of 1971, Kenneth Lajoie (Lajoie) conducted the commissioner survey and, on August 10, 1971, he made an oral report to the Board at a public meeting attended by petitioner and his wife. Lajoie's report indicated that, in his opinion, the present soil conditions were such as to be potentially dangerous, and he recommended further investigation to pinpoint more precisely the exact location of the hazardous areas. In response to his report, the Board placed an immediate freeze on the issuance of any further building permits in the Moss Beach area. On August 31, 1971, the Board passed a resolution extending the building permit freeze for an additional 30-day period. On September 7, 1971, it passed another resolution authorizing the hiring of F. Beach Leighton & Associates, Inc., to study and report on the geological conditions in the Moss Beach area. The Leighton Report was published on October 15, 1971, and stated that the land area in which the subject property is located is the most unstable of all the areas examined and that the feasibility of correction is extremely doubtful. The report also stated that the average rate of cliff retreat *280 over the prior 29-year period was approximately one foot per year and that since 1965 the annual retreat had averaged three to four feet. On March 1, 1972, petitioner's wife filed a complaint against the sellers of the subject property for rescission and cancellation of the sales contract and for punitive damages. On March 8, 1973, a Judge of the Superior Court of Redwood City, California, entered a judgment for the defendants stating, inter alia, as follows: In summary, this court finds that the geologic conditions were patent to any potential buyer who should have been aware of the erosion hazards from the very erection of the dwelling. These risks were voluntarily assumed by plaintiffs. On July 1, 1972, petitioner and his wife separated and she moved from the house. Petitioner moved from the house on July 15, 1972, and allowed the property to revert to the holder of the deed of trust. At such time, the amount still owing on the note was approximately $32,386, and this amount was never paid by petitioner or his wife. The seller repossessed the property and resold it for $40,000 on August 25, 1972. The new purchaser was aware of the geologic instability of the property. *281 The property suffered no significant physical damage from any cause, including geological conditions, at any time during the period it was owned by petitioner's wife. On petitioner's joint 1971 return, he claimed a casualty loss deduction of $19,840. This amount was determined by taking the difference between the two fair market values assigned to the property in 1971 ($20,152) and subtracting $212 previously taken as depreciation and the $100 floor on casualty losses. OPINION On his and his wife's 1971 joint return, petitioner claimed a casualty loss deduction due to an alleged decrease in that year in the fair market value of his wife's home. Solely as a result of this deduction, petitioner claimed net operating loss carrybacks for 1968 and 1969. In his notice of deficiency, respondent disallowed the loss deduction claimed for 1971 as well as the related loss carrybacks to 1968 and 1969. Accordingly, the sole issue before us for each of the years at issue involves the propriety of petitioner's claimed casualty loss deduction for 1971. Section 165(c)(3) allows an individual *282 to deduct a loss sustained to property not connected with a trade or business, if such loss arises from "fire, storm, shipwreck, or other casualty." For the reasons discussed infra, we hold that petitioner's claimed loss deduction fails to qualify under section 165(c)(3) and, accordingly, the deficiencies determined by respondent for the years at issue are sustained. There is a well-recognized line of authority holding that an individual may properly claim a casualty loss deduction only when there has been actual physical damage or destruction to his property. Broido v. Commissioner,36 T.C. 786, 793 (1961), and cases cited. therein. In this regard, petitioner has entered into the following stipulation of fact: The subject property suffered no significant physical damage from any cause, including geological conditions, at any time during the period petitioner's wife owned the property. Petitioner's claimed loss is based solely on an alleged decline in the property's fair market value due to buyer resistance resulting from the unstable land and soil conditions in the area. *283 This type of loss is not deductible as a casualty loss. [2]Kamanski v. Commissioner,477 F. 2d 452 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; Squirt Co. v. Commissioner,51 T.C. 543 (1969); Pulvers v. Commissioner,48 T.C. 245 (1967); Thornton v. Commissioner,47 T.C. 1 (1966). Furthermore, even if the requisite physical change to the property were present in the instant case, there is a clear body of case law holding that the type of "other casualty" contemplated by section 165(c)(3) is "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." Fay v. Helvering,120 F. 2d 253 (2d Cir. 1941); Durden v. Commissioner,3 T.C. 1 (1944); *284 Mitchell v. Commissioner,42 T.C. 953 (1964). In the instant case, we are unable to focus upon any identifiable event or occurrence that could so qualify as an "other casualty." We reject petitioner's contention that the qualifying event was the publication of the Leighton Report on October 15, 1971, which stated that the land in that area was unstable and most likely incapable of correction. The publication of this report is simply not the type of sudden and unexpected invasion by a hostile agency contemplated by the statute. If and to the extent there was any damage to the subject property, it resulted from a steady and continuing erosion of the land and soil and, as such, is not deductible under section 165(c)(3). Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. We share respondent's doubts as to the accuracy of the July 1, 1971 appraisal of $19,752 in light of the fact that the property sold approximately one year later for $40,000 to a buyer who was aware of the surrounding land conditions.↩